STRAUB, Circuit Judge:
 

 Plaintiff Finanz AG Zurich (“Finanz”) appeals from a judgment of the United States District Court for the Southern District of New York (Shira A. Scheindlin,
 
 Judge),
 
 dismissing its complaint on the ground of comity. Finanz sought to recover on certain promissory notes allegedly guaranteed by the defendant, Banco Eco-nómico S.A. (“BESA”). However, BESA is currently subject to an extrajudicial liquidation in Brazil, and the District Court dismissed the action in favor of that foreign proceeding.
 
 See Finanz Ag Zurich v. Banco Economico S.A.,
 
 No. 98 Civ. 0005, 1998 WL 205341 (S.D.N.Y. Apr. 28, 1998). On appeal, Finanz contends that this was an abuse of the District Court’s discretion because deferring to the Brazilian liquidation would violate significant policy interests of the United States as well as principles of due process and fundamental fairness. We disagree and therefore affirm.
 

 BACKGROUND
 

 This case involves a “forfaiting” transaction, which is “an inventive means of facilitating exports to troubled or debt-laden countries.”
 
 A.I. Trade Fin., Inc. v. Petra Bank,
 
 989 F.2d 76, 78 (2d Cir.1993). We have previously described the type of for-faiting present in this case as
 

 involving the sale of goods for promissory notes, [in which] the forfaiter finances the sale by paying the exporter (usually at a substantial discount) and receives in return the importer’s promissory notes....
 

 A forfaiting transaction involves at least one other essential party: a guarantor bank. In the ordinary course, for-faiters will not finance any trade debts without an unconditional and irrevocable guaranty from a bank or other substantial guarantor.... The importer arranges for the bank to guarantee the payment of the note to the forfaiter, at which time the forfaiter becomes fully responsible for payment to the exporter. All burdens of debt collection fall upon the forfaiter, without recourse to the exporter. Upon maturity of the notes, the forfaiter typically presents them to the guarantor for payment.
 

 The guaranty employed in a forfaiting transaction often consists of a two-word endorsement, “per aval,” recorded on the note itself and followed by one or more authorized signatures of the guarantor bank. This endorsement is known as an “aval.” As brief and cryptic as the aval may be, the customs and practices of the forfaiting industry make it a fully articulated contractual obligation.
 

 
 *243
 

 Id.
 
 (footnote omitted). The promissory-notes “are usually payable in a commercial center, where there is an expectation of regularity in financial dealings,” such as in New York.
 
 Id.
 

 In this case, on May 2, 1995, a Brazilian importer, Delba Comercio Importacao e Exportacao Ltda. (“Delba”), issued six promissory notes with a combined face value of over $5.6 million to forfaiter Deutsche Morgan Grenfell Trade Finance Ltd. (“Morgan Grenfell”). These notes, which were to mature one year from their date of issue, were “avalized” or guaranteed by BESA’s Grand Cayman branch (“Grand Cayman Branch”) located in Grand Cayman, Cayman Islands. However, each note stated that it was “payable at” BESA’s New York branch (“New York Branch”), rather than at the Grand Cayman Branch. The notes also referred to the New York Branch as the “[d]omieile for payment.” In a subsequent telex to Morgan Grenfell on May 19, 1995, BESA’s International Division transcribed a message “on behalf of [its] Grand Cayman Branch” in which the Grand Cayman Branch certified that it had “affixed [its] aval” on the promissory notes and that “this ... represented its] irrevocable and unconditional guarantee of payment.” The telex also stated that “[t]he notes should be presented for payment on their respective maturity dates to ourselves [the Grand Cayman Branch]” at the New York Branch.
 

 On or about May 24, 1995, shortly after Morgan Grenfell obtained the promissory notes guaranteed by the Grand Cayman Branch, Finanz purchased three of the notes — with a total face value of $3,000,-000 — on a non-recourse basis for $2,775,-876.86. In a letter dated June 1, 1995, Morgan Grenfell provided Finanz with documentation of the transaction, including a copy of the May 19, 1995 telex “from Banco Económico S.A., Sao Paulo (on behalf of their Grand Cayman Branch)” to Morgan Grenfell and a copy of the three notes that were “domiciled for payment at Banco Económico S.A., New York.” Morgan Grenfell also confirmed that the “signatures of Banco Económico S.A., Grand Cayman Branch” in the documentation were authentic. Morgan Grenfell agreed to retain the promissory notes and to present them for payment upon maturity to the New York Branch on Finanz’s behalf.
 

 However, on August 11, 1995, prior to the maturity date, Brazil’s central bank, Banco Central do Brasil (“Central Bank”), placed BESA and its various branches into “intervention” — a form of pre-bankruptcy financial monitoring allowed by Brazilian law — as a result of insufficient equity and a lack of financial fitness. The Central Bank also appointed an intervenor “with full management power” over BESA’s operations. The Central Bank converted the intervention into an extrajudicial liquidation in August 1996. The record reflects that under Brazilian law an extrajudicial liquidation functions similarly to a bankruptcy proceeding filed in the United States — assets are liquidated and distributed to creditors in an orderly fashion, and all proceedings against the entity in liquidation are stayed. In a Brazilian liquidation proceeding, all claims in foreign currency are converted into the domestic currency, the real. Notice of the liquidation is provided by publication rather than by individualized notice to each creditor of the entity to be liquidated.
 

 As a result of the Central Bank’s intervention, the United States Office of the Comptroller of the Currency (“OCC”) initiated a cease-and-desist proceeding against the New York Branch, which, as a “Federal branch” of BESA in the United States, was licensed by the OCC.
 
 See
 
 12 U.S.C. § 1818(b) (provision of the Federal Deposit Insurance Act describing “cease-and-desist” proceedings); 12 U.S.C. § 3102 (provision of the International Banking Act describing the establishment and regulation of a “Federal branch”); 12 U.S.C. § 3101(6) (defining “Federal branch” as “a branch of a foreign bank established and operating under [12 U.S.C. § 3102]”). The
 
 *244
 
 New York Branch, by its general manager, Getulio Pessoa, eventually stipulated to the issuance of an “Amended Consent Order,” which established guidelines for the maintenance of sufficient assets to repay third-party liabilities as well as procedures for establishing a contingency plan for the ultimate liquidation of the Branch’s assets. The Branch subsequently informed the OCC on July 19, 1996 that it would voluntarily liquidate and cease operations.
 

 On May 2, 1996, Morgan Grenfell on behalf of Finanz presented the promissory notes for payment at the New York Branch, but payment was refused. After receiving a letter from counsel for Finanz requesting payment, Pessoa responded that the notes “appear to have been issued with the ‘avals’ of the Cayman Island Branch” of BESA and that “BESA’s New York branch appears only to have been the location at which the notes were to have been paid.” Accordingly, because the New York Branch was the “paying agent only,” and because “neither BESA’s Cayman Island branch nor the Issuer [Delba] has any funds on deposit with the New York branch with which to pay the notes,” Pes-soa concluded that the New York Branch had no obligation with respect to the promissory notes. Pessoa also described the BESA liquidation proceeding in Brazil and indicated that Finanz could either pursue Delba or assert a claim in the liquidation proceeding once the Central Bank had announced a claims procedure and the deadlines for asserting such claims. On May 16, 1997, the liquidator of BESA published a notice addressed to all of BESA’s creditors in
 
 The New York Times
 
 describing the claims procedures and the deadlines for filing claims. It is undisputed that Finanz filed a timely claim to recover the value of the promissory notes in the Brazilian liquidation.
 

 On December 3, 1997, Finanz filed suit in New York State Supreme Court, New York County, by motion for summary judgment in lieu of a complaint pursuant to New York Civil Practice Law and Rules § 3213, seeking to recover on the $3,000,-000 in notes guaranteed by the Grand Cayman Branch of BESA. BESA removed the action in timely fashion to federal court, asserting that the District Court had jurisdiction under 28 U.S.C. § 1330(a) because BESA’s liquidator, who was appointed by the Central Bank, was the real party in interest and was an “agency or instrumentality of a foreign state” as explained in 28 U.S.C. § 1603(b). BESA then moved to dismiss the action in deference to the Brazilian liquidation proceeding and on the ground of
 
 forum non conve-niens.
 

 Without reaching BESA’s
 
 forum non conveniens
 
 argument, the District Court granted BESA’s motion to dismiss the action in favor of the Brazilian proceeding by opinion and order filed April 28, 1998.
 
 See Finanz Ag Zurich,
 
 1998 WL 205341, at *5. The District Court concluded that deference to the Brazilian liquidation would not “contravene the interest of the United States in enforcing debts payable here” because courts routinely defer to foreign bankruptcy proceedings,
 
 id.
 
 at *2, and there was “no evidence that the Brazilian liquidation proceeding is different in principle from typical bankruptcy actions or that it threatens the very enforceability of the BESA notes,”
 
 id.
 
 at *3. Likewise, the District Court rejected Finanz’s argument that the dismissal on comity grounds would violate the interest of the United States in “the domestic resolution of debts owed by branches of foreign banks located here.”
 
 Id.
 
 at *3 n. 3. In the District Court’s view, although the notes were payable in New York, they “appear to fall outside the OCC’s definition of ‘Third Party Liabilities’ of the New York branch” since the avals were not affixed by the New York Branch but were issued by the Grand Cayman Branch.
 
 Id.
 
 Finally, although Finanz complained that the Brazilian proceeding violated the standards of due process and fundamental fairness because it only required published — as opposed to individualized — notice to creditors
 
 *245
 
 and mandated that all debts be converted into Brazilian reals, the District Court found that neither issue was a sufficient basis to deny comity because Finanz had sufficient notice of the Brazilian proceedings and the currency fluctuation risk was not a violation of fundamental fairness.
 
 See id.
 
 at *4.
 

 Finanz now appeals.
 

 DISCUSSION
 

 I.
 
 Subject Matter Jurisdiction
 

 The parties do not dispute the fact that the District Court had subject matter jurisdiction over this action. However, nothing in the record before us indicates that the District Court addressed the issue, and because we have an independent obligation to determine whether jurisdiction exists, we consider this issue first.
 
 See, e.g., American Lung Ass’n v. Reilly,
 
 962 F.2d 258, 262 (2d Cir.1992) (noting that “we have ‘a special obligation’ to satisfy ourselves of our own jurisdiction as well as that of the district court,” and therefore we would “consider the issue on our own motion”) (citation omitted) (quoting
 
 Bender v. Williamsport Area Sch. Dist.,
 
 475 U.S. 534, 541, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986)). We discuss the jurisdictional issue here because, in this case, it involves a question of first impression.
 

 BESA removed this action pursuant to 28 U.S.C. § 1330(a), which provides for original jurisdiction in the district courts without regard to amount in controversy for “any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.” Section 1603(a) defines a “foreign state” to include an “agency or instrumentality of a foreign state” as defined in 28 U.S.C. § 1603(b); that section, in turn, explains that an “agency or instrumentality of a foreign state” is any entity “(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof ..., and (3) which is neither a citizen of a State of the United States ... nor created under the laws of any third country.”
 

 BESA alleged in its notice of removal that its liquidator, who was appointed by the Central Bank, is the real party in interest and is an “agency or instrumentality of a foreign state” as defined in 28 U.S.C. § 1603(b).
 
 See
 
 Defendant’s Notice of Removal at 2. Neither party disputes either of these assertions, and, in any event, they are supported by the record. Brazil’s Central Bank appoints the liquidator and decrees an extrajudicial liquidation pursuant to Brazilian law. The duly-appointed liquidator is required to act “in the interest of public economy, private savings, and national security” when fulfilling his duties. Declaration of Luiz Fernando Amaral Halembeck ¶ 19 (citing Brazilian law). The liquidator also represents the bankrupt’s estate in court and can file suit on the estate’s behalf. In similar circumstances, other courts have held or suggested that these factors suffice to confer jurisdiction.
 
 See, e.g., Fabe v. Aneco Reinsurance Underwriting Ltd.,
 
 784 F.Supp. 448, 449-51 (S.D.Ohio 1991) (concluding that removal was proper where liquidators appointed by the Supreme Court of Bermuda were the real parties in interest and were an “agency or instrumentality” of Bermuda);
 
 cf. Underwood v. Hilliard (In re Rimsat, Ltd.),
 
 98 F.3d 956, 962-63 (7th Cir.1996) (suggesting that a receiver of a foreign corporation appointed by a foreign court “might conceivably be regarded as the ‘organ’ of a foreign state” under 28 U.S.C. § 1603(b)(2), but finding no jurisdiction because the receiver was a citizen of the United States);
 
 S & S Machinery Co. v. Masinexportimport,
 
 706 F.2d 411, 414 (2d Cir.) (noting that a central bank of a foreign nation is the “paradigm” of an “agency or instrumentality of a foreign state”) (quoting H.R.Rep. No. 1487, at 15-
 
 *246
 
 16 (1976),
 
 reprinted in
 
 1976 U.S.C.C.A.N. 6604, 6614),
 
 cert. denied,
 
 464 U.S. 850, 104 S.Ct. 161, 78 L.Ed.2d 147 (1983). Accordingly, we conclude that the provisions of 28 U.S.C. §§ 1330(a) and 1603(a) and (b) are satisfied and that the District Court properly exercised jurisdiction.
 

 II.
 
 Dismissal Based on International Comity
 

 We review a district court’s decision to extend or deny comity to a foreign proceeding for abuse of discretion.
 
 See Allstate Life Ins. Co. v. Linter Group Ltd.,
 
 994 F.2d 996, 999 (2d Cir.),
 
 cert. denied,
 
 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993);
 
 see also Jota v. Texaco Inc.,
 
 157 F.3d 153, 160 (2d Cir.1998).
 

 As the Supreme Court explained in
 
 Hilton v. Guyot,
 
 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), comity is “the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.”
 
 Id.
 
 at 164, 16 S.Ct. 139. Under this principle, “United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries,”
 
 Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru,
 
 109 F.3d 850, 854 (2d Cir.1997), so long as “the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy,”
 
 Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,
 
 825 F.2d 709, 713 (2d Cir.1987).
 

 We have repeatedly noted the importance of extending comity to foreign bankruptcy proceedings. Since “[t]he equitable and orderly distribution of a debt- or’s property requires assembling all claims against the limited assets in a single proceeding,” American courts regularly defer to such actions.
 
 Id.
 
 at 713-14;
 
 see also Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.),
 
 93 F.3d 1036, 1048 (2d Cir.1996);
 
 Allstate Life Ins. Co.,
 
 994 F.2d at 999 (“[W]e have recognized that comity is particularly appropriate where, as here, the court is confronted with foreign bankruptcy proceedings.”);
 
 Cunard S.S. Co. v. Salen Reefer Servs. AB,
 
 773 F.2d 452, 458 (2d Cir.1985). Nonetheless, we will afford comity to foreign bankruptcies only if those proceedings do not violate the laws or public policy of the United States,
 
 see Cunard S.S. Co.,
 
 773 F.2d at 459, and if “the foreign court abides by ‘fundamental standards of procedural fairness,’ ”
 
 Allstate Life Ins. Co.,
 
 994 F.2d at 999 (quoting
 
 Cunard S.S. Co.,
 
 773 F.2d at 457).
 

 Accordingly, in this case, deferral to the Brazilian extrajudicial liquidation of BESA is appropriate only if it does not violate United States public policy or principles of due process and fundamental fairness. Fi-nanz argues that both are vitiated by the District Court’s decision. Specifically, Fi-nanz contends that (1) the extension of comity violates the United States interest in maintaining New York as a center of commerce and forfaiting; (2) deferral contravenes the United States policy of requiring Federal branches to satisfy all of their liabilities; (3) the Brazilian liquidation offends principles of due process because creditors are not given individualized notice of the bankruptcy; and (4) the Brazilian procedures are fundamentally unfair because the debt is converted into Brazilian reals, thereby forcing the creditor to bear the risk of fluctuations in the value of currency. We consider each of these arguments in turn.
 

 A.
 
 Public Policy
 

 Finanz first maintains that the District Court failed to consider that since New York is the location where the avals were to be paid, the United States has a special interest in ensuring that the debt remains recoverable in New York to maintain New York’s status as a commercial
 
 *247
 
 and forfaiting center. However, while “the United States has a strong interest in ensuring the enforceability of valid debts under the principles of contract law,”
 
 Pravin,
 
 109 F.3d at 855, and “in maintaining New York’s status as one of the foremost commercial centers in the world,”
 
 Allied Bank Int’l v. Banco Credito Agricola de Cartago,
 
 757 F.2d 516, 521 (2d Cir.),
 
 cert. dismissed,
 
 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985), we have also recognized — as we previously noted — the “particular need to extend comity to foreign bankruptcy proceedings,”
 
 Victrix S.S. Co.,
 
 825 F.2d at 713.
 

 The fact that the forfaiting transaction here required payment in New York does not preclude the granting of comity. Indeed, we have rejected an analogous argument seeking the denial of comity to a foreign bankruptcy proceeding because an indenture agreement contained both a forum selection clause requiring that suit on a contract be brought in New York and a choice of law provision selecting New York law.
 
 See Allstate Life Ins. Co.,
 
 994 F.2d at 1000 (noting that such clauses “do[] not preclude a court from granting comity where it is otherwise warranted”). We do not share Finanz’s concern that, as a result of the District Court’s decision, “forfaiters will doubt the efficacy of New York as a payment center” and will “choose to make these transactions payable in other commercial centers.” Appellant’s Brief at 21-22. While forfaiters may require payment in New York because they “expect[ ] ... regularity in financial dealings,”
 
 A.I. Trade Fin., Inc. v. Petra Bank,
 
 989 F.2d 76, 78 (2d Cir.1993), if they wish to ensure collection from the New York branch of an international financial institution in circumstances similar to those presented here, they should — and presumably do— take the additional precaution of having the New York entity itself act as a guarantor.
 

 Finanz also asserts that affording comity to the Brazilian liquidation would violate the interest of the United States in enforcing the liabilities of a Federal branch regulated by the OCC. The New York Branch of BESA is currently in voluntary liquidation and is resolving claims of third-party creditors. Finanz is plainly correct that there is a strong United States policy, as expressed in the International Banking Act, 12 U.S.C. § 3101
 
 et seq.,
 
 and the OCC regulations pertaining to Federal branches, 12 C.F.R. § 28.10
 
 et seq.,
 
 of enforcing the obligations of a Federal branch such as the New York Branch and in ensuring that its liabilities are satisfied as part of its liquidation.
 

 However, like the District Court,
 
 see Finanz Ag Zurich,
 
 1998 WL 205341, at *3 n. 3, we trust the OCC to safeguard this policy interest when it enters into consent orders, and Finanz’s argument therefore has merit only if the avals in this case can be deemed a liability of the New York Branch pursuant to the terms of the Amended Consent Order. The Amended Consent Order defines the “Aggregate Amount of Third Party Liabilities” that the branch must pay from its assets in the liquidation as, in pertinent part:
 

 any liabilities agreed to by the Branch with persons that are neither subsidiaries, Related Parties, Affiliates nor Institution-Affiliated Parties of the Branch or Bank, including, checks issued by the Bank or any of its subsidiaries, Affiliates, Related Parties, or Institution-Affiliated Parties, which have been issued outside of the United States and may be presented to the Branch for payment. This term shall also include bankers’ acceptances, standby or commercial letters of credit and any other contingent liabilities. This term shall not include ... accrued expenses and amounts due and other liabilities to the head office of the Bank and any other branch ... of the Bank or the Branch.
 

 The District Court read this definition to include only those liabilities “agreed to by the Branch,” and, since the avals were not liabilities “agreed to by the Branch,” they were not its obligations under the Amend
 
 *248
 
 ed Consent Order. Finanz does not challenge the District Court’s conclusion that the New York Branch did not “agree[ ] to” the avals. Instead, it relies upon the clause “checks issued
 
 by the Bank
 
 ..., which have been issued outside of the United States and may be presented to the Branch for payment” (emphasis added). Finanz maintains that the word “checks” should be read to include “any other contingent liabilities,” apparently because the next sentence in the definition states, “[t]his term shall also include ... any other contingent liabilities.” According to Fi-nanz, since the Grand Cayman Branch affixed the avals and made them payable at the New York Branch, and the International Division of BESA “confirmed” these facts, the guaranties are contingent liabilities issued by BESA outside of the United States that may be presented to the New York Branch for payment.
 

 However, we conclude that the District Court did not exceed its allowable discretion in reading the Amended Consent Order to include only those liabilities “agreed to by the Branch” within the definition of the New York Branch’s third-party liabilities. As Finanz states, the Order is “hardly a model of clarity,” Appellant’s Brief at 23, and the District Court’s understanding of the Order comports with the plain language of the document. Thus, since the New York Branch did not “agree[ ] to” the avals, it cannot now be held liable for the notes under the terms of the Amended Consent Order.
 

 Even if the agreement of the New York Branch were not required for payment of “checks issued by the Bank ..., which have been issued outside of the United States and may be presented to the Branch for payment,” we would still conclude that United States policy was not violated for two reasons. First, we disagree with Finanz’s reading of the definition of “Aggregate Amount of Third Party Liabilities” such that the word “checks” includes “any other contingent liabilities,” such as the avals. We believe that the sentence “[t]his term shall also include ... any other contingent liabilities,” and more specifically, the words “[t]his term,” refer to the “term” being defined, “Aggregate Amount of Third Party Liabilities.” Therefore, this sentence merely sets forth additional types of liabilities that may be included within the total amount of third-party liabilities for purposes of the Amended Consent Order, and does not change the plain meaning of the word “checks.”
 

 Second, the avals were issued not “by the Bank” but by the Grand Cayman Branch and accordingly are not obligations of the New York Branch. The Amended Consent Order repeatedly distinguishes between the Bank and its branches. Thus, it defines the term “Bank” as “Banco Eco-nómico, S.A., Salvador, Bahia, Brazil” and “Branch” as “Banco Económico, S.A., New York, New York.” In addition, the definition of the term “Aggregate Amount of Third Party Liabilities” states that “[t]his term shall not include ... accrued expenses and amounts due and other liabilities to the head office of the Bank and
 
 any other branch
 
 ... of the Bank or the Branch” (emphasis added). Further, in its definition of “eligible assets,” the Amended Consent Order excludes,
 
 inter alia,
 
 “any other asset pledged as security in any financial transaction with the Branch, Bank, or any branch ... of the Bank or Branch.” Hence, since the Order repeatedly differentiates between “branch” and “Bank” and considers them separate entities for general purposes and, more importantly, for its definition of “third party liabilities” in particular, the aval affixed by the Grand Cayman Branch cannot be considered a contingent liability “issued by the Bank.”
 

 Furthermore, to the extent that Finanz argues that the avals are an obligation of “the Bank” because they were “confirmed by the International Division,” Appellant’s Brief at 24, that contention is simply not supported by the record. Without deciding whether the International Division actually represents “the Bank,” the Interna
 
 *249
 
 tional Division did not issue the notes or affix the avals. Moreover, the record reflects that it never confirmed or “certified” the obligation, Appellant’s Brief at 7; instead, in a telex dated May 19, 1995 to Morgan Grenfell, the International Division merely “transcribe^]” a message from the Grand Cayman Branch with respect to the avals. In that message, the Grand Cayman Branch — and not the International Division — certified that it had affixed its aval on each of the notes.
 

 In sum, we hold that the District Court did not exceed its allowable discretion in concluding that deferral to the Brazilian liquidation would not violate policy interests of the United States.
 
 [1]
 

 B.
 
 Due Process and Fundamental Fairness
 

 Finanz next asserts that affording comity to the Brazilian proceeding would violate due process because Brazilian law does not require individualized notice to creditors. To determine whether a foreign bankruptcy proceeding “abidefs] by fundamental standards of procedural fairness,”
 
 Cunard S.S. Co.,
 
 773 F.2d at 457, we have focused on several factors as “indicia of procedural fairness,” including:
 

 (1) whether creditors of the same class are treated equally in the distribution of assets; (2) whether the liquidators are considered fiduciaries and are held accountable to the court; (3) whether creditors have the right to submit claims which, if denied, can be submitted to a bankruptcy court for adjudication; (4) whether the liquidators are required to give notice to the debtors potential claimants; (5) whether there are provisions for creditors meetings; (6) whether a foreign countrys insolvency laws favor its own citizens; (7) whether all assets are marshalled before one body for centralized distribution; and (8) whether there are provisions for an automatic stay and for the lifting of such stays to facilitate the centralization of claims.
 

 Allstate Life Ins. Co.,
 
 994 F.2d at 999. As it did in the District Court, Finanz argues that only the fourth factor is not satisfied. However, although the Brazilian proceeding apparently does not require individualized notice, Finanz received actual notice of the Brazilian proceeding from the general manager of the New York Branch and subsequently filed a timely claim. Accordingly, the District Court correctly concluded that there was no due process violation.
 
 See, e.g., Baker v. Latham Sparrowbush Assocs.,
 
 72 F.3d 246, 254 (2d Cir.1995) (“If a party receives actual notice that apprises it of the pendency of the action and affords an opportunity to respond, the due process clause is not offended.”);
 
 United States (Drug Enforcement Agency) v. One 1987 Jeep Wrangler,
 
 972 F.2d 472, 482 (2d Cir.1992). Furthermore, we disagree with Fi-nanz’s contention that
 
 this
 
 action should
 
 *250
 
 not be dismissed in favor of the Brazilian liquidation proceeding, simply because
 
 other
 
 creditors might receive inadequate notice of this or another such proceeding.
 
 Cf. Cunard S.S. Co.,
 
 773 F.2d at 457 (explaining that grant of comity to a foreign judgment turns on “whether the defendant
 
 in the particular suit
 
 was such a person as to be bound by the judgment” (internal quotation marks omitted) (emphasis added)).
 

 Finally, we reject Finanz’s argument that the Brazilian proceeding is fundamentally unfair because it requires the conversion of Finanz’s claims into Brazilian reals. It may well be that this practice places the risk of currency fluctuation on Finanz. Nonetheless, the United States applies a similar practice in its bankruptcy proceedings,
 
 see
 
 11 U.S.C. § 502(b) (providing that, as a general matter, “the court, after notice and a hearing, shall determine the amount of such claim in
 
 lawful currency of the United States as of the date of the filing of the petition,
 
 and shall allow such claim in such amount” (emphasis added)), and it is not surprising that Brazil would utilize such a procedure to promote the orderly liquidation of claims. Of course, if the early conversion of a creditor’s claims into foreign currency would render a debt unenforceable or valueless, we might have cause to conclude that a conversion procedure was fundamentally unfair.
 
 Cf. Pravin,
 
 109 F.3d at 855. However, Finanz does not make this complaint, and that situation is not before us. Accordingly, we agree with the District Court that the conversion procedure in this case is not fundamentally unfair.
 

 CONCLUSION
 

 For all of the foregoing reasons, the judgment of the District Court is affirmed.
 

 [1]
 

 . Finanz also asserts that the District Court’s interpretation of our decision in
 
 Pravin
 
 was wrong and that, as in
 
 Pravin,
 
 affording comity to the Brazilian proceeding is not appropriate because Finanz may not collect on the notes for the foreseeable future due to the complexity of the BESA liquidation. However, Finanz misreads
 
 Pravin.
 
 In that case, we affirmed a District Court's refusal to defer to voluntary negotiations to resolve Peru’s foreign debt under the so-called Brady Plan.
 
 See Pravin,
 
 109 F.3d at 852-53. The Brady Plan negotiations were intended to be "strictly voluntary” and were not subject to any well-defined completion date.
 
 Id.
 
 at 855. We drew a distinction between the typical foreign liquidation proceeding, which is generally afforded comity, and the Brady Plan negotiations, which "would ... have denied Pravin its right to enforce the underlying debt—despite clear United States policy that it be able to do so—by making Pravin’s rights conditional on the completion of a process which had no obvious (and reasonably proximate) termination date.”
 
 Id.
 
 We also expressed our concern that deferring to the Brady Plan negotiations "would have converted what the United States intended to be voluntary and open-ended negotiations ... into the equivalent of a judicially-enforced bankruptcy proceeding.”
 
 Id.
 
 Here, unlike in
 
 Pravin,
 
 we are faced with a foreign bankruptcy proceeding that is not connected to Brady Plan negotiations and, although it might take several years to complete, does not threaten the long-term enforceability of the debt.