**JP MORGAN CHASE BANK,**
**Plaintiff–Appellant,**

v.

**ALTOS HORNOS DE MEXICO, S.A.**
**DE C.V., Defendant–Appellee.**

**Docket No. 04–0450–CV.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 3, 2004.

Decided June 22, 2005.

Jonathan L. Greenblatt, Washington, D.C. (Jared A. Goldstein, Shearman & Sterling LLP, Washington, D.C.; James D. Greenhalgh, J.P. Morgan Chase Legal Department, New York, New York, of counsel), for Plaintiff–Appellant.

Mitchel H. Ochs, New York, New York (Jason A. Stern, Anderson & Ochs, LLP, New York, New York, of counsel), for Defendant–Appellee.

Before: WALKER, Chief Judge, CARDAMONE and HALL, Circuit Judges.

CARDAMONE, Circuit Judge.

J.P. Morgan Chase Bank (J.P. Morgan, bank, or appellant) filed a complaint in the United States District Court for the Southern District of New York before Judge Harold Baer seeking a judgment declaring that certain funds held in a collection account in the bank belonged to it. Appellee Altos Hornos de Mexico, S.A. de C.V. (Altos Hornos, debtor, or appellee), a Mexican steel manufacturer, had borrowed $330 million from a consortium of banks led by

J.P. Morgan, which also managed the collection account for receiving the loan payments. Three Altos Hornos customers made payments directly into this collection account at the bank. Matters proceeded in the normal course until Altos Hornos filed for bankruptcy in Mexico, at which point the funds in the collection account became the subject of the instant litigation. The debtor moved to dismiss the bank's complaint on grounds of international comity, asking the federal court in New York to defer to the bankruptcy court in Mexico. The district court granted that motion to dismiss. J.P. Morgan appeals.

On this appeal we are asked to clarify the scope of our holding in *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag)*, 961 F.2d 341, 349 (2d Cir.1992), where we ruled that the ownership of property a debtor claims as part of its estate in a foreign bankruptcy proceeding is a question "antecedent to the distributive rules of bankruptcy." Local courts may resolve the question because international comity does not require deference to the parallel foreign bankruptcy proceeding in such circumstances. *Id.* at 349. The rule announced in *Koreag*, however, only applies to disputes that present a *bona fide* question of property ownership. It has no application to disputes like this one where a bankruptcy creditor claims to own assets but has a contractual obligation to use those assets to pay down the same debt that is the subject of a foreign bankruptcy proceeding. In such a case, local courts are displaced and must defer to the foreign proceeding. We therefore affirm the district court's order dismissing appellant's complaint on international comity grounds.

## BACKGROUND

A. *The Loan and Security Agreements*

On April 11, 1997 appellee Altos Hornos de Mexico, S.A. de C.V.—one of Mexico's largest steel producers—concluded a loan agreement with J.P. Morgan and a consortium of 27 other banks under which the banks agreed to loan Altos Hornos a total of $330 million to pay off a preexisting loan by J.P. Morgan to Altos Hornos and to fund Altos Hornos' ongoing operations. J.P. Morgan was also designated as the "Facility Agent," meaning that it established and managed a collection account into which certain payments would be made and from which J.P. Morgan would distribute funds to the other consortium members.

According to the terms of the loan agreement, J.P. Morgan established the collection account in its own name at its office in New York. It had exclusive power to withdraw funds from the account, but only for specified purposes in the following priority: (1) to cover its own expenses and fees, (2) to pay interest and principal on the loan to itself and other consortium members, and (3) to refund any surplus funds to Altos Hornos.

Like most contracts, the loan agreement contained forum selection and choice of law clauses under which the parties agreed that New York law would govern any disputes and that the United States District Court for the Southern District of New York or any New York state court in New York City were acceptable forums. The debtor also "irrevocably waive[d], to the fullest extent permitted by applicable law, any claim that any action or proceeding commenced by the Facility Agent ... should be dismissed or stayed by reason, or pending the resolution, of any action or proceeding commenced by [the debtor] relating in any way to this Agreement whether or not commenced earlier."

The parties entered into a security agreement on the same day they concluded

the loan agreement. Under the security agreement, Altos Hornos assigned its right to payment from three of its customers—Thyssen Handelsunion AG, Kloeckner & Co. AG, and Ferrostaal AG—to J.P. Morgan for deposit in the collection account. These payments were "collateral security for the prompt payment in full when due . . . of the Secured Obligations," and effectively required each of the three customers to make deposits directly into the collection account as payment on the debtor's loan. Any payments the three customers mistakenly made to Altos Hornos were to be turned over to J.P. Morgan for deposit in the collection account as soon as possible, and in the meantime were to be held by the debtor in trust "for and as the property of the Facility Agent [J.P. Morgan] and shall not be commingled with any other funds or property of [the debtor]."

### B. *Altos Hornos Enters* Suspension De Pagos

Altos Hornos defaulted on its loan in April 1999, and the following month it filed for *suspension de pagos* (suspension of payments) (SOP) in a Mexican civil court. Much like Chapter 11 reorganization in the United States, SOP is a judicial order authorized under Mexican law that allows a debtor to suspend payments to its creditors and continue normal operations until such time as the debtor and creditors, under the auspices of the court, reorganize the debt. The Mexican court granted Altos Hornos' petition and issued the SOP order. J.P. Morgan, for itself and on behalf of the other consortium banks, appeared before the Mexican court to ac-

knowledge its claim as secured creditors for the remaining balance on the loan, which included $225,355,617.25 in principal and $1,912,330.78 in interest. The Mexican court acknowledged the consortium's claims but ruled that J.P. Morgan and the other banks were general unsecured creditors because the debtor's agreement to permit three of its customers to pay directly into the collection account was an "assignment" rather than "collateral" and thus did not qualify the banks as secured creditors under Mexican law. Both J.P. Morgan and Altos Hornos appealed this ruling, and the Mexican appellate court denied both appeals in February 2004. J.P. Morgan took an appeal to the Mexican federal court, which reversed the lower courts in January 2005 and held that the consortium banks are secured creditors.[1] To date, Altos Hornos continues to operate in *suspension de pagos* and has not resumed payment on its debt.

### C. *The Dispute Over Funds in the Collection Account*

During the summer of 1999, following the Mexican court's SOP declaration, the three customers of the debtor that had agreed to pay directly into the collection account continued to do so. Their payments totaled approximately $4.7 million, from which the bank withdrew $880,708 for payment of its legal fees and expenses in connection with its participation in the SOP proceeding. According to the record before us, no further payments or deductions have been made and the account has been inactive since January 2003.

---

1. Shortly before we issued this opinion, appellant brought a motion for voluntary dismissal of its appeal in light of the Mexican federal court's January 27, 2005 ruling that J.P. Morgan is a secured creditor under Mexican law. Altos Hornos opposes this motion. We conclude that the Mexican court's ruling does not resolve any of the issues properly before us. Moreover, we note that J.P. Morgan waited nearly two months to inform this Court of the Mexican judgment, a delay that raises questions about procedural propriety on J.P. Morgan's part. We therefore deny appellant's motion.

In December 2002 Altos Hornos petitioned the Mexican court to summon J.P. Morgan to return the $4.7 million and to issue a letter rogatory to a New York court requesting assistance in enforcing the summons. The debtor sought this remedy to prevent the bank from collecting part of the debt outside the SOP proceeding. The bank opposed the debtor's motion on the ground that the Mexican court lacked jurisdiction to consider Altos Hornos' petition. The Mexican court deferred decision on the debtor's motion pending resolution of the parties' appeals related to the acknowledgment of J.P. Morgan's claim, and thus made no decision regarding its jurisdiction or the ownership of the assets.

### D. *Proceedings Below*

On March 18, 2003 the bank filed suit in the Southern District of New York seeking a declaration that it owned the funds in the collection account. Altos Hornos moved to dismiss because, *inter alia*, principles of international comity counsel a U.S. court to abstain from deciding such questions and to defer to a pending foreign bankruptcy proceeding. In an opinion and order dated January 7, 2004, the district court granted the debtor's motion to dismiss. *JP Morgan Chase Bank v. Altos Hornos De Mexico, S.A.*, No. 03 Civ.1900, 2004 WL 42268, at *8 (S.D.N.Y. Jan. 8, 2004). The district court found the issue of who owns the collection account "was implicitly raised by Altos Hornos" before the Mexican court and that Mexican law "does not dictate one way or the other where the dispute must be decided." *Id.* at *5, *7. It further ruled that the choice of law and forum selection clauses in the loan agreement would not control where international comity warranted abstention. *Id.* at *7. And, it concluded that because the issue had been raised before the Mexican court, and that court had jurisdiction to

decide the question, international comity required the district court to abstain and allow the issue to be resolved in the Mexican proceedings. *Id.* at *7–*8. J.P. Morgan appeals from this order.

### DISCUSSION

J.P. Morgan raises three issues on appeal. It contends the district court erred, first, in finding that the ownership issue had been raised before a Mexican court with jurisdiction to hear the claim; second, in finding that international comity justifies abstention in this case; and third, in refusing to honor the loan agreement's choice of law and forum selection clauses. We agree with the bank that the trial court's analysis was not entirely correct, although we think it reached the proper result. In our view, appellant's first claim of error is irrelevant to our decision, and we are unpersuaded by the bank's second and third claims of error.

### I Standard of Review

■ Declining to decide a question of law on the basis of international comity is a form of abstention, and we review a district court's decision to abstain on international comity grounds for abuse of discretion. *See, e.g., Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir.1999); *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 999 (2d Cir.1993). We recognize that in other abstention cases involving the "act-of-state" doctrine and some forms of domestic federal-state abstention, we apply a "somewhat more rigorous" standard of review than abuse of discretion that approaches *de novo* review. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 90 (2d Cir.2004); *Bigio v. Coca–Cola Co.*, 239 F.3d 440, 451 (2d Cir.2000); *Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir.1998). Because our international comity abstention cases

rely on the abuse of discretion standard, we apply that standard in this case. Of course, in evaluating the district court's exercise of discretion, we review its conclusions of law *de novo*. *Sheerbonnet, Ltd. v. Am. Express Bank Ltd.*, 17 F.3d 46, 48 (2d Cir.1994).

## II International Comity

### A. *A Brief Review of Its Origins*

International comity has been described by the Supreme Court as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The doctrine has never been well-defined, leading one scholar to pronounce it "an amorphous never-never land whose borders are marked by fuzzy lines of politics, courtesy, and good faith." Harold G. Maier, *Extraterritorial Jurisdiction at a Crossroads: An Intersection Between Public and Private International Law*, 76 Am. J. Int'l L. 280, 281 (1982).

Whatever its precise contours, international comity is clearly concerned with maintaining amicable working relationships between nations, a "shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards." *British Airways Bd. v. Laker Airways Ltd.*, [1984] E.C.C. 36, 41 (Eng.C.A.). We have stated that the doctrine is not an imperative obligation of courts but rather is a discretionary rule of " 'practice, convenience, and expediency.' " *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir.1997) (*quoting Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971)).

Scholars trace the origins of international comity to the emergence of the nation-state in Europe and the corresponding rise in international commerce. *See* Joel R. Paul, *Comity in International Law*, 32 Harv. Int'l L.J. 1, 13–14 (1991). The doctrine as we know it developed from the writings of 17th century Dutch scholars, including Paul and John Voet and Ulrich Huber, *id.* at 14–17, and was imported into English common law by Lord Mansfield, who refined the doctrine to exclude deference to foreign law in cases where the plaintiff's claim is not "allowed or approved by the law of England." *Id.* at 19 (*quoting Somerset v. Stewart*, 98 Eng. Rep. 499 (1772), *as reprinted in* Robert M. Cover, *Justice Accused* 87 (1975)). Lord Mansfield used this interpretation of comity to order the release of an American-owned slave held on board ship in England. *Id.* at 19.

Justice Joseph Story introduced the doctrine to American jurisprudence, primarily as a means of reconciling the competing laws of free and slave states with respect to fugitive slaves by allowing each state a principled way to accommodate (and, if necessary, avoid) the law of the others. *Id.* at 21–22. Story opined that comity between nations is appropriate due to "mutual interest and utility," Joseph Story, *Commentaries on the Conflict of Laws* § 35 (8th ed. 1883), even if it is an "imperfect obligation" that " 'cannot be reduced to any certain rule.' " *Id.* §§ 28, 33 (*quoting Saul v. His Creditors*, 5 Mart.(n.s.) 569, 595–96 (La.1827)). Story also shared Lord Mansfield's view that comity should not be extended to contradict the forum state's law or policy. *See id.* § 38. The Supreme Court expressly adopted Justice Story's views, first in *Bank of Augusta v. Earle*, 38 U.S. 519, 589, 13 Pet. 519, 10 L.Ed. 274 (1839) (citing Story for the prop-

osition that comity, as "part of the voluntary law of nations," "promote[s] justice between individuals [and] a friendly intercourse between the sovereignties to which they belong" but is "inadmissible when contrary to [the forum state's] policy, or prejudicial to its interests"), and, most famously, in *Hilton v. Guyot*, 159 U.S. at 163–65, 16 S.Ct. 139, discussed above.

### B. International Comity and Foreign Bankruptcy Proceedings

International comity, as it relates to this case, involves not the choice of law but rather the discretion of a national court to decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction. *See Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036, 1047 (2d Cir.1996). We have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding. "Since '[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding,' American courts regularly defer to such actions." *Finanz AG*, 192 F.3d at 246 (*quoting Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713–14 (2d Cir.1987)); *Allstate Life Ins. Co.*, 994 F.2d at 999. In such cases, deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and (consistent with the principles of Lord Mansfield's holding) do not contravene the laws or public policy of the United States. *Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457–59 (2d Cir.1985).

### III   The *Koreag* Exception

#### A.   Koreag

We identified a limited exception to this rule in *Koreag*, 961 F.2d 341. In *Koreag*, the debtor, a Swiss bank known as Mebco, had a currency exchange contract with a New York currency trading corporation known as Refco. Under the terms of the contract, Refco deposited U.S. currency in a Mebco-owned bank account in New York and Mebco agreed to exchange the deposited funds for foreign currency. Refco deposited over 7 million U.S. dollars in the Mebco account, but Mebco failed to perform the required exchange into foreign currency and instead declared bankruptcy in Switzerland. *See id.* at 344–45. The Swiss bankruptcy court appointed Koreag as Mebco's liquidator.

Refco brought suit against Mebco in the United States District Court for the Southern District of New York and claimed ownership of the $7 million it had previously deposited in Mebco's account. *See id.* at 346. Refco argued that because it never received Mebco's corresponding payment of foreign currency, Mebco had no right to the funds that had been advanced to it. Koreag intervened as Mebco's successor-in-interest and moved to dismiss on international comity grounds. The district court did not dismiss or decide Refco's claim, but instead determined that the case should be addressed in a "turnover" proceeding pursuant to 11 U.S.C. § 304(b)(2). *Koreag*, 961 F.2d at 346.

Koreag subsequently brought such an action in a United States bankruptcy court seeking a turnover of the assets in Mebco's New York bank account as property of Mebco's estate under 11 U.S.C. § 304(b)(2) and sought summary judgment. *Koreag*, 961 F.2d at 346–47. The bankruptcy court granted Koreag's motion for summary judgment; it held that international comity warranted turning over all disputed assets to Koreag for distribution in the Swiss bankruptcy proceeding and therefore de-

clined to reach the threshold ownership issue. *Id.* at 346–47. The district court consolidated Refco's suit and its appeal from the bankruptcy court's judgment and affirmed.

We vacated the district court's order and remanded for reconsideration, holding that disputes with respect to the ownership of assets do not always implicate the concerns that ordinarily require international comity abstention in foreign bankruptcy proceedings. We stated

> Property interests have an independent legal source, antecedent to the distributive rules of bankruptcy administration, that determines in the first instance the interests of claimant parties in particular property. It logically follows that before a particular property may be turned over pursuant to § 304(b)(2), a [United States] bankruptcy court should apply local law to determine whether the debtor has a valid ownership interest in that property when the issue is properly posed by an adverse claimant.

*Id.* at 349. We observed that Mebco's other creditors would not be prejudiced by a threshold determination as to property ownership. Refco, we held, was not asserting rights like a creditor in a bankruptcy proceeding, but rather was asserting that Mebco did not own the disputed currency. *Id.* Since other creditors only have valid claims against the estate's *bona fide* assets, we concluded that Refco's claim was "antecedent to the distributive rules of bankruptcy administration" and thus properly adjudicated in a U.S. court. *Id.*

#### B. *The District Court's Treatment of* Koreag

The district court in this case placed heavy reliance on a distinction drawn in *Koreag* between the language in 11 U.S.C. § 304(b)(2) (which permits a bankruptcy court to "order turnover of the property of [the foreign debtor's] estate") and § 304(b)(1) (which allows a U.S. court to "enjoin the commencement or continuation of . . . any action against . . . a debtor with respect to property involved in [a] foreign [bankruptcy] proceeding"). We noted in *Koreag* that the phrase "property involved in [a] foreign [bankruptcy] proceeding" found in § 304(b)(1) is broader than the phrase "property of [the foreign debtor's] estate" found in § 304(b)(2). *Koreag*, 961 F.2d at 348. Thus, we reasoned there is more need for a conclusive threshold determination of ownership in a § 304(b)(2) proceeding. *Id.* The district court decided "*Koreag* is not controlling where, as here, a foreign debtor seeks injunctive relief pursuant to [§ ] 304(b)(1) rather than the turnover of property pursuant to § 304(b)(2)." *JP Morgan Chase Bank*, 2004 WL 42268, at *5. It therefore ruled that international comity abstention was warranted.

We are not persuaded by the trial court's reasoning. For one thing, this is not an action under *either* § 304(b)(1) or § 304(b)(2). Altos Hornos did not seek injunctive relief; rather, it moved to dismiss on comity grounds a claim brought by J.P. Morgan to resolve an ownership dispute.[2] While it is true that such dismissal

**2.** We note that Altos Hornos' decision to seek dismissal on international comity grounds rather than a defensive § 304(b) injunction is entirely proper. *See Cunard,* 773 F.2d at 456 (commenting that "[i]t is clear that the drafters of [11 U.S.C. § 304] did not intend to overrule in foreign bankruptcies well-established principles based on considerations of international comity"). Indeed, even if Altos Hornos had sought a § 304(b) injunction, the court's decision whether to grant relief would necessarily "be guided by what will best assure an economical and expeditious administration of [the bankrupt] estate, consistent with [*inter alia* ] comity." 11 U.S.C. § 304(c) (2000).

may effectively bar J.P. Morgan from relitigating the same issue in U.S. courts, that is not the same as an action by the debtor for an injunction barring J.P. Morgan from litigating these issues in the U.S. courts.

■ Moreover, *Koreag* does not stand for the proposition that federal courts are barred from determining ownership in a § 304(b)(1) proceeding. *Koreag* stated that such a determination is less relevant under § 304(b)(1) because that section covers property "involved in" a foreign bankruptcy proceeding, which is not strictly limited to the debtor's estate. *See Koreag,* 961 F.2d at 348. Of course, a debtor's assertion that it owns an asset is not automatically sufficient to "involve" that asset in the debtor's estate.[3] We leave for another day, when the issue is squarely presented, the task of determining when a court may resolve an ownership question under § 304(b)(1) without deference to a foreign bankruptcy proceeding. For now, we simply observe that the district court's reliance on § 304(b)(1) as an automatic escape from its duty to resolve the threshold question of property ownership was, in our view, error.

In sum, the district court improperly concluded that Altos Hornos' motion to dismiss was a request for a § 304(b)(1) injunction, and it further improperly concluded that determinations of likely ownership are always inapplicable when dealing with such injunctions. As a consequence, we agree with appellant that the district court erroneously limited the *Koreag* exception to § 304(b)(2) turnover actions. *Bona fide* questions of property ownership—whether or not raised in a § 304(b)(2) turnover action—are anteced-

ent to the distributive rules of bankruptcy administration because they seek to determine whether an asset is actually part of the debtor's estate, rather than deciding the entitlement of certain creditors to pieces of that estate. Property ownership questions thus precede distribution and, for the reasons stated in *Koreag,* are best resolved under local law.

■ We thus reaffirm *Koreag*'s rule that U.S. courts may resolve *bona fide* questions of property ownership arising under local law while a foreign bankruptcy proceeding is ongoing without deferring to the parallel foreign proceeding on grounds of international comity.

## IV  Application of the *Koreag* Exception to Appellant's Claims

We conclude that J.P. Morgan does not raise a *bona fide* question of property ownership. Thus, the rule set out in *Koreag* is inapplicable in this case, and the district court, although its reasoning was flawed, properly abstained on grounds of international comity.

### A.  *J.P. Morgan's "Ownership" Claim*

Appellant contends it owns the assets in the collection account. First, it asserts that because the loan agreement states that the collection account is established in J.P. Morgan's name, and the debtor has no power to withdraw funds from the account, the assets in the account are the bank's property. Second, it relies on the security agreement, which states that any payments assigned to J.P. Morgan and mistakenly made to Altos Hornos must be turned over to J.P. Morgan for deposit in the collection account as soon as possible,

---

**3.** In *Koreag,* for example, we noted that the bankruptcy court has considered the threshold ownership issue in § 304(b)(1) proceedings, finding that property "was sufficiently connected to the debtor under New York law

to be 'involved in' the foreign insolvency proceeding." *Koreag,* 961 F.2d at 350 (*citing In re Lines,* 81 B.R. 267, 272 (Bankr.S.D.N.Y. 1988)).

and in the meantime must be held by the debtor in trust "for and as the property of the Facility Agent [J.P. Morgan] and shall not be commingled with any other funds or property of [Altos Hornos]." On the basis of this provision, appellant argues that Altos Hornos has contractually agreed to treat the assets in the collection account as J.P. Morgan's property.

■ These arguments are misguided. Unlike in *Koreag*, the funds in the collection account never belonged to J.P. Morgan. Rather, these funds were mistakenly paid *by the debtor* (via three of its customers, from whom Altos Hornos assigned its right to payment as collateral on the debt) as partial payment on the debt after the debtor had already filed for *suspension de pagos* in Mexico. If we determined that appellant owned the funds in the collection account, it would still have a contractual obligation—not only to the debtor, but to the other consortium members—to distribute those funds in partial satisfaction of Altos Hornos' debt. In other words, appellant could not do with the money as it pleased, but rather would have to use those funds to pay down the same debt that is the subject of the Mexican SOP proceeding. This is precisely the sort of end-run around a parallel foreign bankruptcy proceeding of which we have repeatedly disapproved. *See, e.g., Finanz AG*, 192 F.3d at 246–47; *Allstate Life Ins. Co.*, 994 F.2d at 999–1000; *Victrix*, 825 F.2d at 713–14.

Hence, it appears that J.P. Morgan's alleged ownership claim is simply a creditor's thinly veiled attempt to extract partial payment from the debtor on the debt owed outside a foreign bankruptcy proceeding. This the bank may not do. Our cases establish that creditors may not use U.S. courts to circumvent foreign bankruptcy proceedings, and the exception in *Koreag* only applies to *bona fide* property

ownership questions, which is not the case here. The district court thus rightly abstained from assuming jurisdiction and deferred to the ongoing Mexican SOP proceeding.

### B. *Raising the Ownership Issue Before the Mexican Court*

Both parties discuss at great length the extent to which the ownership question was previously raised before the Mexican SOP court and whether or not the Mexican court has jurisdiction to consider the ownership question. J.P. Morgan asserts the ownership issue was never properly before the Mexican court and, in any event, that the Mexican SOP court lacks jurisdiction under Mexican law to determine the ownership of assets being held in an American bank. Appellant thus concludes that there is no foreign court with proper jurisdiction to which the district court could extend comity in the first place. Altos Hornos insists the ownership issue was implicitly raised when it petitioned the Mexican court for a summons directing J.P. Morgan to return the $4.7 million in the collection account. The district court found Altos Hornos' view persuasive. *J.P. Morgan Chase Bank*, 2004 WL 42268, at *5.

In light of our holding above, we do not reach this issue. Inasmuch as the bank's claim is really that of a creditor seeking payment on a debt, the only issue for us to decide is whether the *debt* is the subject of a parallel foreign bankruptcy proceeding to which the district court should defer. There is no dispute between the parties that the Mexican SOP proceeding is a foreign bankruptcy proceeding. There is also no question that Altos Hornos' debt to the bank and its consortium partners is properly before the Mexican SOP court; J.P. Morgan appeared before the Mexican court and was acknowledged as a general unsecured creditor owed a debt of

$225,355,617.25 in principal and $1,912,330.78 in interest. Accordingly, we think the salient issue (i.e., the debt) has been raised before the proper Mexican court, and thus there exists a parallel foreign proceeding to which the district court could defer.

### C. *Fairness of the Mexican Proceedings*

█ It is well established that we defer to foreign bankruptcy proceedings on international comity grounds only if those proceedings "do not violate the laws or public policy of the United States and ... abide[ ] by 'fundamental standards of procedural fairness.'" *See Finanz AG*, 192 F.3d at 246 (*quoting Cunard*, 773 F.2d at 457–59). Nothing in the record before us suggests that the actions taken by the Mexican bankruptcy court are not approved or allowed by American law. In its reply brief, however, appellant contends the six-year delay in resolving Altos Hornos' debts before the Mexican SOP court is procedurally unfair and U.S. courts should therefore decline to extend comity to such proceedings.

█ We begin by observing that arguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief. *See, e.g., O'Hara v. Weeks Marine, Inc.*, 294 F.3d 55, 67 n. 5 (2d Cir.2002); *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993). Of course, we have discretion to excuse such an error if manifest injustice would otherwise result. *Frank v. United States*, 78 F.3d 815, 833 (2d Cir.1996), *vacated on other grounds*, 521 U.S. 1114, 117 S.Ct. 2501, 138 L.Ed.2d 1007 (1997); *United States v. Babwah*, 972 F.2d 30, 34–35 (2d Cir.1992).

█ Here, no manifest injustice would result if we did not consider the procedural unfairness argument raised in J.P. Morgan's reply brief. The delay in the resolution of Altos Hornos' debts is due, in substantial part, to appellant's decision to appeal the Mexican court's determination that the consortium members are general unsecured creditors. Until there is a final determination of the consortium's status, a payment arrangement between Altos Hornos and its creditors cannot be worked out because over $225 million worth of debt is held by creditors whose priority in distribution is uncertain. We note that the Mexican appeals court dismissed J.P. Morgan's appeal in February 2004 but appellant chose to appeal to the Mexican federal court, further delaying the proceedings. Only recently did the Mexican federal court rule in J.P. Morgan's favor. Thus, there is no injustice in refusing to allow appellant to claim procedural unfairness due to a delay it helped create.

### D. *The Forum Selection and Choice of Law Clauses*

Finally, appellant avers that the district court erred in refusing to consider the loan agreement's choice of law and forum selection clauses, under which Altos Hornos agreed that the loan agreement would be governed by New York law, agreed to submit any dispute to the United States District Court for the Southern District of New York or any New York State court in New York City, and "irrevocably waive[d], to the fullest extent permitted by applicable law, any claim that any action or proceeding commenced by the Facility Agent ... should be dismissed or stayed by reason, or pending the resolution, of any action or proceeding commenced by [debtor] relating in any way to this Agreement whether or not commenced earlier."

█ Appellant contends that under these clauses, Altos Hornos agreed not to

seek dismissal of J.P. Morgan's action in the Southern District of New York and agreed to allow the consortium to sue for collection of the debt in New York, regardless of the pendency of bankruptcy proceedings in another country. The bank's reading of the loan agreement is defensible, and Altos Hornos may well have agreed to the terms J.P. Morgan suggests. We have no cause to reach this issue, however, because the fact that such clauses are in an agreement between the parties does not preclude a court from deferring on grounds of international comity to a foreign tribunal where deference is otherwise warranted. *See Allstate Life Ins. Co.*, 994 F.2d at 1000. In other words, regardless of the parties' pre-litigation agreement, once a party declares bankruptcy in a foreign state and a foreign court asserts jurisdiction over the distribution of assets, U.S. courts may defer to the foreign bankruptcy proceeding on international comity grounds. Consequently, J.P. Morgan's reliance on the loan agreement's forum selection and choice of law clauses is unavailing.

## CONCLUSION

We have considered appellant's remaining arguments and find them all to be without merit. For the foregoing reasons, the district court's order granting appellee's motion to dismiss appellant's complaint is affirmed, and appellant's motion for voluntary dismissal of its appeal is denied.