20-3343(L)

# United States Court of Appeals
# For the Second Circuit

August Term 2021

Argued: September 24, 2021
Decided: October 14, 2022

Nos. 20-3343(L), 20-3346(Con), 20-3349(Con)

IN RE: SEARS HOLDINGS CORPORATION

ESL INVESTMENTS, INC., AND CERTAIN OF ITS AFFILIATED ENTITIES, JPP, LLC, JPP II, LLC, WILMINGTON TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND COLLATERAL AGENT, CYRUS CAPITAL PARTNERS, L.P.,

*Appellants,*

*v.*

SEARS HOLDINGS CORPORATION

*Debtor-Appellee,*

SEARS HOME IMPROVEMENT PRODUCTS, INC., KMART HOLDING CORPORATION, SEARS, ROEBUCK AND CO., SEARS PROCUREMENT SERVICES, INC., SEARS PROTECTION COMPANY (PR) INC., SEARS PROTECTION COMPANY, SEARS ROEBUCK ACCEPTANCE CORP., SR-ROVER DE PUERTO RICO, LLC, BIG BEAVER OF FLORIDA DEVELOPMENT, LLC., CALIFORNIA BUILDER APPLIANCES, INC., KMART OF WASHINGTON LLC, SEARS BRANDS BUSINESS UNIT CORPORATION, SEARS HOLDINGS PUBLISHING COMPANY, LLC, SEARS PROTECTION COMPANY (FLORIDA), L.L.C., SHC DESERT SPRINGS, LLC, A&E HOME DELIVERY, LLC, SEARS OPERATIONS LLC, A&E LAWN & GARDEN, LLC, A&E SIGNATURE SERVICE, LLC, FBA HOLDINGS INC., INNOVEL SOLUTIONS, INC.,

SEARS HOLDINGS MANAGEMENT CORPORATION, SEARS HOME & BUSINESS FRANCHISES, INC., SEARS INSURANCE SERVICES, L.L.C., FLORIDA BUILDING APPLIANCES, INC., KMART STORES OF TEXAS LLC, KMART OF MICHIGAN, INC., SHC PROMOTIONS LLC, SYW RELAY LLC, A&E FACTORY SERVICE LLC, KMART.COM LLC, KMART OPERATIONS LLC, SHC LICENSED BUSINESS LLC, SERVICELIVE INC., SRE HOLDING CORPORATION, KMART CORPORATION, MAXSERV, INC, PRIVATE BRANDS, LTD., SEARS DEVELOPMENT CO., KBL HOLDING INC., KMART STORES OF ILLINOIS LLC, KLC, INC., WALLY LABS LLC, MYGOFER LLC, SOE, INC., TROY COOLIDGE NO. 13, LLC, SEARS BRANDS MANAGEMENT CORPORATION, STARWEST, LLC, BLUELIGHT.COM, INC., SEARS BUYING SERVICES, INC., STI MERCHANDISING, INC., SEARS BRANDS, L.L.C., OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF SEARS HOLDINGS CORPORATION, ET AL, SEARS, ROEBUCK DE PUERTO RICO, INC., FLORIDA BUILDER APPLIANCES, INC.,

*Appellees.*[*]

---

Appeal from the United States District Court
for the Southern District of New York
No. 19-cv-7660, Vincent L. Briccetti, *Judge*,
No. 18-B-23538, Robert D. Drain, *Bankruptcy Judge*.

---

Before:  SULLIVAN, BIANCO, *Circuit Judges*, and CHEN, *District Judge*.[†]

The Sears Holdings Corporation and its affiliates (collectively, the "Debtors" or "Sears") carried approximately $2.68 billion of first- and second-lien secured debt at the time of its bankruptcy petition.  The first-lien debt has since been paid in full.  The holders of the second-lien debt, however, alleged that they were paid

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

[†] Judge Pamela K. Chen, of the United States District Court for the Eastern District of New York, sitting by designation.

less than the value of the collateral that secured their claims. To recoup the difference, the second-lien holders sought relief under section 507(b) of the Bankruptcy Code, arguing that the value of their collateral decreased during the course of the bankruptcy proceeding, which entitled them to priority payment of the difference. The bankruptcy court (Robert D. Drain, *Bankruptcy Judge*) disagreed, finding that the value of the second-lien holders' collateral had not decreased since the date the Debtors filed for bankruptcy and that, in fact, the second-lien holders had received more than the value of their collateral.

On appeal, the second-lien holders raise a number of objections to the bankruptcy court's valuation methodology, as well as to its valuation of several specific categories of collateral. Because the bankruptcy court reasonably determined that the second-lien holders had already recovered more than the value of their collateral on the date of the bankruptcy petition, we affirm its denial of the second-lien holders' section 507(b) claims.

AFFIRMED.

<div style="margin-left:40%">

ANDREW M. LEBLANC, Milbank LLP, Washington, D.C. (Robert J. Liubicic, Thomas R. Kreller, Eric R. Reimer, Milbank LLP, Los Angeles, CA, *on the briefs*), *for Appellant* Cyrus Capital Partners, L.P.

Edward M. Fox, Owen R. Wolfe, Seyfarth Shaw LLP, New York, NY, *for Appellant* Wilmington Trust, National Association, as Indenture Trustee and Collateral Agent.

Philip D. Anker, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, *for Appellants* ESL Investments, Inc., and certain of its affiliated entities, including JPP, LLC, and JPP II, LLC.

GREGORY SILBERT, Weil, Gotshal & Manges LLP (David J. Lender, Richard Gage, Robert Niles-Weed, Weil, Gotshal & Manges LLP, New York,

</div>

3

NY, Paul R. Genender, Erin Choi, Weil Gotshal & Manges LLP, Dallas, TX, *on the brief*), *for Appellees* Sears Holdings Corporation, et al.

Z.W. Julius Chen, Akin Gump Strauss Hauer & Feld, LLP, Washington, D.C., Ira S. Dizengoff, Joseph L. Sorkin, Akin Gump Strauss Hauer & Feld LLP, New York, NY, *for Appellee* Official Committee of Unsecured Creditors of Sears Holding Corporation, et al.

RICHARD J. SULLIVAN, *Circuit Judge*:

This case entails complex calculations and challenging legal theories, but the inquiry at its core comes down to a fundamental concept: how to value the assets and liabilities of a company. On October 15, 2018, when the Sears Holdings Corporation and its affiliates (collectively, the "Debtors" or "Sears") filed their bankruptcy petition (the "Petition Date"), they carried approximately $2.68 billion of debt. One set of priority creditors – the "first-lien holders" – have since been paid in full and do not challenge the value that they have been able to recoup from the Debtors. Another set of creditors – the "second-lien holders," who were entitled to payment only after the debts to the first-lien holders had been discharged – were not so satisfied. In the bankruptcy court, they argued that the value of the collateral that secured their claims, as measured on the Petition Date, vastly exceeded what they have been paid, and that they are accordingly entitled

4

to priority payment of the difference pursuant to section 507(b) of the Bankruptcy Code. The bankruptcy court (Robert D. Drain, *Bankruptcy Judge*) disagreed, valuing the second-lien holders' collateral at a sum less than what they had already been paid, and accordingly denied their claims for any additional payment. The district court (Vincent L. Briccetti, *Judge*) affirmed the bankruptcy court's decision in full. The second-lien holders appealed. For the reasons set forth below, we **AFFIRM** the judgment of the district court, which in turn affirmed the judgment of the bankruptcy court.

## I. BACKGROUND

When the Debtors filed for bankruptcy in 2018, they operated 687 stores across the country and employed approximately 68,000 workers. At that time, their debt obligations to the first- and second-lien holders were secured principally by the Debtors' inventory and their rights to payment still owed for goods and services they had previously provided. On the Petition Date, neither the Debtors nor their creditors knew whether Sears would be sold or liquidated.

The filing of a chapter 11 bankruptcy petition triggers an automatic stay that prevents creditors from taking "possession of [the debtor's] property." 11 U.S.C. § 362(a)(3). As a result, the second-lien holders, including Appellants ESL

Investments, Inc. ("ESL"), Wilmington Trust, National Association ("Wilmington Trust"), and Cyrus Capital Partners LP ("Cyrus"), were prevented from foreclosing on their collateral. Instead, they were provided with "adequate protection," a statutory right designed to preserve the Petition-Date value of a secured creditor's collateral. *Id.* § 363(e). Specifically, "adequate protection" entitles secured creditors to "a cash payment" or "an additional or replacement lien" in the event of a decrease in the value of their collateral during the bankruptcy proceedings. *Id.* § 361(1)–(2). To the extent that the adequate-protection mechanism fails to preserve the value of the collateral, the creditors are entitled to administrative "super-priority," a right to payment ahead of all other creditors up to the amount of the value lost. *In re Blackwood Assocs.*, 153 F.3d 61, 68 (2d Cir. 1998); *see also* 11 U.S.C. § 507(b).

As is often the case with bankruptcies involving retailers, much of the collateral was the Debtors' inventory. Because such collateral is inherently short-lived and is often sold by debtors at fire-sale prices, the bankruptcy court provided the second-lien holders with adequate protection in the form of replacement liens that granted them section 507(b) super-priority over all other

6

creditors' claims to make up for any diminution in value of their collateral following the Petition Date.

Shortly after the Petition Date, the Debtors entered into negotiations to sell substantially all their assets. After a series of bids that the Debtors rejected, Sears's largest secured creditor, the hedge fund ESL, made a bid through an ESL-controlled entity, Transform Holdco, LLC, to purchase substantially all of the Debtors' assets, which the Debtors accepted. On February 8, 2019, the bankruptcy court approved the transaction, and the Debtors sold substantially all their assets to Transform for approximately $5.2 billion. This sum was comprised of largely non-cash consideration including, as especially relevant here, a $433.5 million "credit bid," which for practical purposes forgave debt that the Debtors owed to ESL, Wilmington Trust, and Cyrus in exchange for a dollar-for-dollar reduction in the purchase price. Although Wilmington Trust and Cyrus were not parties to the transaction, the terms of the credit documents required them to take part in the credit bid, and their rights to payment were thus reduced accordingly.

According to the second-lien holders, the $433.5 million credit bid falls far short of the Petition-Date value of the collateral that secured their claims. As a result, pursuant to section 507(b) of the Bankruptcy Code, the second-lien holders

7

asserted super-priority treatment of the diminution in value of their collateral during the course of the bankruptcy proceeding. Those section 507(b) claims are the subject of this appeal.

As noted above, to assert a successful section 507(b) claim, the second-lien holders' collateral must have decreased in value after the Petition Date. To determine whether the collateral had decreased in value, the bankruptcy court had to calculate the Petition-Date value of the Debtors' collateral and then subtract from this amount the obligations owed to the first-lien holders, as measured on the Petition Date. The second-lien holders have a viable section 507(b) super-priority claim only if this figure exceeds the $433.5 million credit bid ESL already recouped in the transaction.[3]

On July 23 and 31, 2019, the bankruptcy court held a hearing to determine the Petition-Date value of the collateral. At the hearing, the bankruptcy court heard testimony from valuation experts put on by the Debtors and each second-lien holder, whose assessments of the collateral's value varied widely.

---

[3] Additionally, the agreement governing the Debtors' sale to Transform contained a provision that limited to $50 million the distributions ESL could receive "from the proceeds of any Claims or causes of action of the Debtors or their estates," if ESL were to bring a section 507(b) claim. J. App'x at 1943–44. Thus, in the event that the bankruptcy court determined that the second-lien holders were entitled to more than $50 million in section 507(b) super-priority claims, it then had to decide from which sources of funds, if any, the agreement permitted such a recovery.

Marti Murray, Cyrus's expert, valued the collateral on the Petition Date at a minimum of $2.46 billion; David Schulte, ESL's expert, valued it at $2.928 billion; and William Henrich, Wilmington Trust's expert, set the value at $3.28 billion. The differences among these values turned primarily on how the experts calculated the revenue Debtors could expect to earn from selling their inventory – for instance, whether the inventory would be sold at full retail price; a depressed, going-out-of-business or liquidation price; or an orderly company-wide going out of business sale that would sell the Debtors' assets at more than their liquidation value, but less than their full retail price – a point in the price range known as net orderly liquidation value ("NOLV").

After taking evidence, the bankruptcy court decided that it would value the bulk of Debtors' collateral based on the NOLV because, on the Petition Date, a complete liquidation of the Debtors' assets was a genuine possibility. It then determined that the inventory's NOLV was 88.7% of its $2.69 billion book value, and after subtracting 1.3% as an estimate of the overhead costs and legal fees that would be associated with liquidating that inventory, arrived at a total value of 87.4% of the inventory's book value.

With that general approach as its starting point, the bankruptcy court proceeded to make several valuations of other collateralized assets, some of which are no longer at issue. As relevant here, the bankruptcy court undertook to value the Debtors' "non-borrowing-base" ("NBB") inventory, a set of inventory that, for one reason or another, creditors are not willing to lend against – such as live plants in stores, in-transit inventory that would eventually be sold at stores, and inventory that had remained on the shelves even after a store's going-out-of-business sale. Placing significant importance on its determination that the second-lien holders bore the burden of valuing this inventory, the bankruptcy court valued the NBB inventory at zero dollars because, in its view, the second-lien holders had failed to offer a reasonable valuation method for those goods.

The bankruptcy court then considered how to value approximately $395 million in letters of credit held by the Debtors. As a general matter, letters of credit require a bank to assume the obligations incurred by the letter's "purchaser" in the event that the purchaser is unable to meet those obligations itself. *See, e.g.*, *3Com Corp. v. Banco de Brasil, S.A.*, 171 F.3d 739, 741 (2d Cir. 1999). In this case, the Debtors had purchased letters of credit to pay, among other things, workers'

compensation claims brought by their employees. According to the terms of the letters, if the Debtors were unable to meet certain specified obligations, the issuers of the letters of credit would pay out the sums owed and would in turn be entitled to repayment from the Debtors' bankruptcy estate ahead of the second-lien holders.

The bankruptcy court acknowledged that the letters of credit were undrawn on the Petition Date, making their value at that time somewhat speculative. Nonetheless, the court determined that "the realistic context of this case [on the Petition Date was] a short-term sale process, with the very real backdrop of a potential liquidation in which the Sears Debtors would go out of business"; accordingly, the bankruptcy court concluded that, on the Petition Date, the letters of credit were likely to be drawn because "[t]he beneficiaries of the letters of credit would not simply let their collateral in the form of a letter of credit go away." Sp. App'x at 28. The bankruptcy court further explained that the second-lien holders did not propose any means of valuing the letters of credit that accounted for their contingent nature. Rather, the second-lien holders suggested either ignoring the letters of credit entirely because they represented contingent obligations, or else subtracting only the roughly $9 million in letters of credit that

11

were *actually* drawn during the subsequent bankruptcy proceedings. The bankruptcy court found the first suggestion to be untenable and the second to be in conflict with the goal of valuing the collateral *on the Petition Date*. Reasoning that the second-lien holders bore the burden of explaining how to value the letters of credit but proposed no sensible method of doing so, the bankruptcy court subtracted the full face value of the letters from the value of the inventory on the Petition Date.

After making these calculations, the bankruptcy court concluded that the collateral on the Petition Date was worth $2.147 billion. The bankruptcy court also determined that creditors senior to the second-lien holders had claims totaling $1.96 billion and subtracted that amount from the $2.147 billion valuation of all the collateral, yielding only $187 million for the second-lien holders. But since the second-lien holders had already realized more than this from the $433.5 million credit bid, the bankruptcy court held that they were not entitled to any further recovery in the form of section 507(b) super-priority claims. The district court (Vincent L. Briccetti, *Judge*) affirmed in full, and the second-lien holders timely appealed.

## II. STANDARD OF REVIEW

"[A]n order of the district court functioning in its capacity as an appellate court in a bankruptcy case is subject to plenary review." *In re Jackson*, 593 F.3d 171, 176 (2d Cir. 2010). In other words, we independently and directly review the bankruptcy court's decision. In so doing, we "accept[] the bankruptcy court's factual findings unless they are clearly erroneous, and review[] its conclusions of law *de novo*." *Id.*

## III. DISCUSSION

The key question in this case is the value of the second-lien holders' collateral on the Petition Date, which, as the second-lien holders agree, is the value that controls for purposes of adequate protection and section 507(b) administrative super-priority claims.[4] As recounted above, the second-lien holders are entitled to section 507(b) super-priority payment to the extent that the value of the Debtors' collateral on the Petition Date, minus the value of the first-lien holders claims on that date, exceeds the $433.5 million credit bid the second-lien holders already

---

[4] It is not settled that the Petition Date is the appropriate time at which to value the collateral. *See, e.g.*, 4 *Collier on Bankruptcy* ¶ 506.03[10] (16th ed. 2022). But the bankruptcy court is entitled to deference as to the appropriate time at which to value the collateral, *see In re Heritage Highgate*, 679 F.3d 132, 142 n.7 (3d Cir. 2012) (citing *Collier on Bankruptcy*), and neither party challenges its selection of the Petition Date as the appropriate time, so we proceed on the assumption – at least in this case – that the collateral must be accorded its Petition-Date value.

received.  The second-lien holders raise three challenges to the bankruptcy court's valuation of the collateral on the Petition Date.  They argue that the bankruptcy court erred when it (1) valued the bulk of the Debtors' inventory using the inventory's NOLV – and an errantly low NOLV at that – rather than the inventory's book or replacement value, (2) set at zero the value of the Debtors' NBB inventory, and (3) deducted the full face value of the undrawn letters of credit.  We address each argument in turn.

## A.  The Bankruptcy Court's Calculation of NOLV

The second-lien holders raise several challenges to the bankruptcy court's approach to valuing their collateral.  Their primary argument is that the bankruptcy court fundamentally erred by not valuing the bulk of the Debtor's inventory at its "book" or "replacement" value instead of the NOLV, which is the value that the Debtors could have expected to realize in an orderly liquidation of the business.  They also argue that, even within the NOLV framework, the bankruptcy court erred in assigning insufficient value to the collateral.

### 1.  The Proper Valuation Framework

According to the second-lien holders, the Supreme Court's decision in *Associates Commercial Corp. v. Rash*, 520 U.S. 953 (1997), required the bankruptcy

court to value the Debtor's inventory at its replacement value. The second-lien holders alternatively argue that, to the extent *Rash* permitted the bankruptcy court to deviate from the replacement-cost standard, it should have settled upon a higher, retail value, rather than NOLV.

### a. The Replacement-Value Standard

We review the bankruptcy court's application of *Rash* – which is a pure question of law – de novo. *See Jackson*, 593 F.3d at 176.

*Rash* involved a debtor who "exercised the 'cram down' option" afforded by 11 U.S.C. § 1325(a)(5)(B), which permits a debtor "to retain and use the creditor's collateral" over the creditor's objection, provided that the creditor is paid "the present value of the collateral." 520 U.S. at 955, 957. Alternatively, the debtor may simply surrender the collateral to the creditor. *See id*. at 962. The debtor in *Rash* sought to keep a tractor trailer that he used in his freight-hauling business, requiring him to pay his creditor the present value of the truck. *See id.* at 956–57. The Supreme Court thus had to decide the present value of the tractor trailer under 11 U.S.C. § 506(a), which instructs that "[s]uch value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). The *Rash* creditor maintained that

the value should be assessed based on "the price the [debtor] would have to pay to purchase a like vehicle," known as the "replacement value" of the truck, whereas the debtor argued "that the proper valuation was the net amount [the creditor] would realize . . . . if it exercised its right to repossess and sell the truck," known as the "foreclosure value" of the truck. *Rash*, 520 U.S. at 957–58.

The Supreme Court valued the truck at its replacement value. *Id.* at 962–63. It explained that the statutory distinction between the "'disposition or use' of the collateral . . . turns on the alternative the debtor chooses – in one case the collateral will be surrendered to the creditor, and in the other, the collateral will be retained and used by the debtor." *Id.* at 962. According to the Supreme Court, assessing collateral at its foreclosure value regardless of what the debtor does with it "attributes no significance to the different consequences of the debtor's choice to surrender the property or retain it." *Id.* at 962. By contrast, assessing collateral at its replacement value, at least under the circumstances in *Rash*, respects the debtor's "actual use" of the collateral, "rather than" taking cues from "a foreclosure sale that will not take place." *Id.* at 963.

Citing *Rash*, the second-lien holders argue that because the Debtors "retained and used" the collateral, it should be accorded its replacement value.

16

Appellant Br. at 47–48 (emphasis omitted). The Debtors counter that they proposed to "dispos[e]" of the collateral by selling it – likely in a going-concern sale or a complete liquidation – and so the bankruptcy court permissibly based its valuation on the NOLV. Debtors Br. at 40.

The parties' dispute requires us to decide whether the sale of collateral is properly categorized as a "disposition or use" under section 506(a) – an issue the *Rash* Court had no need to address. 11 U.S.C. § 506(a)(1). In interpreting section 506(a), we begin, as always, "with the statutory text." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). Section 506(a) instructs that the value of collateral "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1); *see also Rash*, 520 U.S. at 961–62 (identifying this sentence of the statute as the one that dictates how collateral should be valued). When a word is not defined by statute, the word is given its "ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Surely, selling inventory falls within the common meaning of the word "disposition." *See Disposition*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("The act of transferring something to another's care or possession."). Accordingly, the Debtors' sale of the inventory is properly categorized as a

17

"disposition." *See* Sp. App'x at 32 (explaining that, on the Petition Date, everyone knew "the Debtors were going to *dispose* of substantially all of their assets in a very short time" (emphasis added)).

Of course, one could employ the verb "use" to describe the sale of inventory, but that is not the "common meaning" of the word in this context. *Perrin*, 444 U.S. at 42. If Sears had proposed to take its ample supply of washers and dryers and convert its stores into a chain of laundromats, then it might be said that it was "using" the washers and dryers, just as the appellant in *Rash* "used" his truck to generate income for the debtor in that case. But, of course, that is not what the Debtors ever proposed to do. Instead, the Debtors sensibly, and predictably, elected to sell the collateral, which falls squarely within the meaning of the word "disposition." Whether those sales were at liquidation prices, retail prices, or somewhere in between, the expectation was that the collateral would be disposed of, not used.

Although the *Rash* Court did not consider the proper valuation method for a proposed "disposition" of retail inventory, the Court's reasoning is instructive. In explaining that replacement value – and not foreclosure value – should be the touchstone of the valuation inquiry in *Rash*, the Court reasoned that the debtor

had opted "to use the collateral to generate an income stream," and that this actual use – as opposed to a foreclosure sale that would not occur – was "the proper guide under a prescription hinged to the property's 'disposition or use.'" 520 U.S. at 963. Thus, when valuing collateral pursuant to section 506(a), the value of the property should be calculated "in light of the 'disposition or use' in fact 'proposed,' not the various dispositions or uses that might have been proposed." *Id.* at 964. In other words, *Rash* contemplated that one *particular* use or disposition must be proposed, and that this proposal must guide the valuation exercise.

Here, on the Petition Date, neither the Debtors nor the second-lien holders knew precisely how the collateral would be sold. Nonetheless, the bankruptcy court reasonably recognized that there were two "realistic scenarios" – a going-concern sale or a forced liquidation. Sp. App'x at 28. Given this backdrop, the bankruptcy court reasonably decided to assess the value of the second-lien holders' collateral in light of what the Debtors would likely be able to recoup from the collateral using the NOLV, which assessed the collateral somewhere between a forced liquidation and its full retail price. *See, e.g.*, *In re Aerogroup Int'l, Inc.*, 601 B.R. 571, 586 (Bankr. D. Del. 2019) (reporting that a particular expert valuation premised on an orderly liquidation was approximately 70% greater than one

19

premised on a forced liquidation). Far from being clearly erroneous, this determination was, by any measure, a sensible one.

### b. The Retail Value Standard

The second-lien holders additionally argue that even if the bankruptcy court was permitted to deviate from the replacement-value standard, it should have valued the collateral based on its retail value, rather than NOLV, because the Debtors did not ultimately liquidate, but instead continued operating many of their stores for months before selling the rest of their business as a going concern. But the valuation process in this case turned on the value of the collateral on the Petition Date, without inquiring into how the collateral was *ultimately* used.[5]

---

[5] *Rash* held that it is the "actual use" of the inventory that guides the valuation, but that analysis came in the context of explaining that the debtor's "elect[ion] to use the collateral," rather than surrender it, requires using the replacement value of the collateral. 520 U.S. at 963. *Rash* does not hold that the manner in which collateral was actually sold, subsequent to the Petition Date, dictates its value on the Petition Date. The second-lien holders also cite language from *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 457 (1999), and *Matter of MPM Silicones, LLC*, 874 F.3d 787, 800 (2d Cir. 2017), for the proposition that courts should not "disregard[] available efficient market rates" because "long-standing precedent dictat[es] that 'the best way to determine value is exposure to a market.'" *Matter of MPM Silicones*, 874 F.3d at 800 (quoting *Bank of Am. Nat'l Tr. & Sav. Ass'n*, 526 U.S. at 457). We do not dispute that exposure to the market is a crucial data point in assessing value (although we note that there was expert testimony that ESL itself ended up paying only approximately 85% of the collateral's book value in order to purchase it). But the valuation here did not turn on the bankruptcy court's guess at what consideration the collateral would have fetched at a certain type of sale, such as a foreclosure sale. Instead, the bankruptcy court's valuation was grounded in its assessment that a distressed-asset sale was likely on the Petition Date, and the second-lien holders do not identify any authority suggesting that the bankruptcy court was obliged to reconsider that assessment in light of subsequent developments.

The second-lien holders pivot to arguing that even on the Petition Date, the Debtors were clearly contemplating either continued operation of their stores or a going-concern sale. But while the bankruptcy court was aware of these optimistic, best-case-scenario intentions harbored by the Debtors, it also considered that the Debtors were far from financially healthy on the Petition Date, and a company-wide liquidation was possible. The bankruptcy court's decision to settle on an orderly liquidation value was therefore not an unreasonable conclusion.

### 2. The Bankruptcy Court's NOLV Analysis

Finally, the second-lien holders argue that, even within an NOLV framework, the bankruptcy court's valuation excessively reduced the value of the Debtors' inventory by assessing it at merely 88.7% of its book value. Because this aspect of the bankruptcy court's valuation turns on a question of fact – whether it arrived at an appropriate NOLV for the collateral – we review it for clear error. *See Jackson*, 593 F.3d at 176. Finding none, we do not disturb the bankruptcy court's NOLV assessment.

To value the collateral, the bankruptcy court used as its principal guide the methodology of one of the second-lien holders' own experts, Ms. Murray, who recommended using NOLV based on the fact that there were no bids for the

21

Debtors' business on the Petition Date, but that Debtors had repeatedly represented that they were ready at any moment to commence a full liquidation sale. *See* J. App'x at 4855–56 (describing Murray's approach). The bankruptcy court also explained the shortcomings of Murray's analysis and the reasons why it would not follow her conclusions completely. As for Schulte's report, which recommended the highest valuation, the bankruptcy court explained that it gave "next to no weight" to that assessment because the valuation indiscriminately discounted *all* the Debtors' inventory at all the stores by less than 1% from its book value. Sp. App'x at 15. The bankruptcy court cited a number of deficiencies in this approach, including its failure to differentiate among various types of inventory and its refusal to acknowledge that the Debtors would not receive anything near "book value" for any merchandise at the many stores that were going out of business.

The second-lien holders argue that the bankruptcy court should have placed more weight on the valuations of Abacus, the Debtors' liquidation advisor, which estimated that the collateral would be valued at between 90% and 93% of book value. But the bankruptcy court explained that it considered these "data points," Sp. App'x at 20–21, and found Murray's analysis to be more useful because it more

22

accurately reflected the likelihood that existed on the Petition Date of an eventual distressed-asset sale. Indeed, the second-lien holders do not even dispute that, on the Petition Date, a distressed-asset sale was regarded as a reasonably high-probability outcome. Accordingly, we find no clear error in the bankruptcy court's analysis.

<p style="text-align:center">*          *          *</p>

For all the reasons stated above, we conclude that the bankruptcy court made no error of fact or law in devising its general approach to valuing the collateral in this case. Its decision to use NOLV was consistent with section 506(a), *Rash*, and the facts of this case, and the manner in which it analyzed the NOLV of the collateral was not clearly erroneous.

## B. The Non-Borrowing Base Inventory

We turn next to the first of two specific valuation decisions that the second-lien holders challenge: the bankruptcy court's decision to assign zero value to the NBB inventory.

The bankruptcy court determined that the second-lien holders, as secured creditors, bore the burden of demonstrating the collateral's value, and that because the only valuation assessment they offered – which assessed the NBB inventory in

the same manner as the rest of the inventory – was plainly unsatisfactory, the NBB inventory should be assigned a zero value. On appeal, the second-lien holders argue that the bankruptcy court was wrong not to attribute any value to the NBB inventory. For their part, the Debtors admit that "the ineligible inventory may well have had some value," Debtors Br. at 51, but argue that the bankruptcy court did not err by valuing the collateral at zero, given that the second-lien holders had failed to meet their burden of proof with respect to valuation.

This Circuit has not yet addressed which party has the burden of proof for section 507(b) claims. We do not resolve the question here, however, as the second-lien holders did not preserve this issue on appeal. Indeed, throughout the bankruptcy proceeding, the second-lien holders conceded that they had the burden of proving the value of the collateral. *See* J. App'x at 3980 (second-lien holders acknowledging "their burden of demonstrating an actual diminution in the value of their Petition[-]Date collateral justifying their adequate protection liens and potential [s]ection 507(b) administrative claims"); *id.* at 4459:18–19 (counsel for ESL conceding before the bankruptcy court that as a secured party it bore "the burden of proving what [its] secure claim was"); *id.* at 4843:13 (counsel for Wilmington Trust similarly conceding that it "ha[s] the burden" under section

24

507(b)). It was not until their reply brief that the second-lien holders argued, for the first time, that they did not have the burden of proving the value of the collateral. Reply Br. at 4, 15. But a party's failure to press an argument in its opening brief generally precludes our review of that issue, and we see no reason to deviate from the rule here, especially since the second-lien holders conceded the point below. *See JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) (observing that "arguments not made in an appellant's opening brief are waived even if the appellant pursued those arguments in the district court or raised them in a reply brief"); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). Accordingly, the second-lien holders have forfeited the argument that they did not have the burden of proof for their section 507(b) claims.

As for the value of the NBB inventory, we find that the court did not err in declining to value the NBB inventory in the same manner as it valued the rest of the inventory – a determination that the second-lien holders no longer challenge. Among other reasons justifying the bankruptcy court's decision to differentiate between NBB inventory and regular inventory, counsel for ESL admitted before the bankruptcy court that it was aware of no case that had ever ascribed full book value to NBB inventory. And given that the first- and second-lien holders

25

themselves differentiated between the bulk of Debtors' inventory and the NBB inventory, we are certainly not "left with the definite and firm conviction that" the bankruptcy court was mistaken in making such a distinction. *In re CBI Holding Co.*, 529 F.3d 432, 449 (2d Cir. 2008) (internal quotation marks omitted).

Although the second-lien holders now concede that the NBB inventory was worth less than the book value that they argued for below, they nevertheless contend that the bankruptcy court erred in assigning it zero value. We disagree. As the parties acknowledged below, and as we assume for purposes of this appeal, the second-lien holders bore the burden of proof and were required to present the bankruptcy court with a credible method to value their collateral as of the Petition Date. Because the bankruptcy court reasonably rejected the only valuation methodology offered by the second-lien holders – to value the NBB in the same manner as the rest of the inventory, at book value – we cannot say that it was error for the bankruptcy court to assign zero value to the NBB inventory. In other words, having proposed no specific or plausible argument that the collateral had any value, the second-lien holders plainly failed to carry their burden of proof, and the bankruptcy court was not obliged to manufacture an alternative valuation

method for them.  Accordingly, on the record before us, we find no clear error in the bankruptcy court's determination that the NBB had zero value.

## C.  The Letters of Credit

The second-lien holders' arguments concerning the letters of credit fail for the same reason.  As the bankruptcy court explained, on the Petition Date, the letters of credit were contingent obligations that, if incurred, would have had priority over the claims of the second-lien holders; nevertheless, the bankruptcy court was uncertain as to whether and to what extent the letters of credit would be drawn.  The second-lien holders, who again conceded that they bore the burden of proof on this issue, offered two possible approaches to valuing the letters of credit:  (1) ignore them altogether, since it was uncertain that they would be drawn at all, or (2) deduct only the approximately $9 million that was ultimately drawn after the Petition Date.

The bankruptcy court was entitled to reject both approaches.  In related contexts, courts have explained that the valuation of contingent obligations must consider the likelihood that the obligations may not arise.  *See Matter of Xonics Photochemical, Inc.*, 841 F.2d 198, 200–01 (7th Cir. 1988); *id.* at 201 (explaining that when determining whether a business is insolvent, contingent liabilities must not

27

"be treated as definite liabilities even though the contingency has not occurred"). When valuing "contingent liabilit[ies], it is necessary to discount [the liability] by the probability that the contingency will occur and the liability become real." *Id.* at 200. For instance, a contingent liability with a face value of $100, but only a 25% chance that the contingency comes to pass, should be valued at $25. *Cf. id.* (giving a similar example). Indeed, the bankruptcy court here appropriately acknowledged that one could potentially value the letters of credit based on a probabilistic formula, discounting their face value by some probability that they would actually be drawn. Sp. App'x 28–29.

But the second-lien holders never offered any such analysis. Even on appeal, they make little effort to defend a valuation other than "zero." At bottom, the second-lien holders' argument for why the letters of credit should be discounted rests entirely on the fact that the letters were "not drawn on the petition date." Sp. App'x at 29. But the bankruptcy court reasonably rejected this argument, which ignored the "realistic context of this case," including "the very real backdrop of a potential liquidation," and the resulting need to tap available sources of capital. *Id.* at 28.

The second-lien holders' alternative proposal – to value the letters of credit in accordance with how they were subsequently drawn – fares no better. The Petition-Date value of the letters of credit does not hinge on whether, with the benefit of hindsight, the letters were actually drawn. What matters is the likelihood of the contingency *on the Petition Date*. The bankruptcy court thus reasonably rejected this after-the-fact valuation methodology. Because the second-lien holders failed to offer any reasonable method of discounting the letters of credit as of the Petition Date, the bankruptcy court did not err by deducting their full face value from the value of the collateral, especially given the court's view that, on the Petition Date, there would be a need to tap available sources of capital.

*        *        *

In sum, the bankruptcy court committed no legal or factual error in its decision to value the collateral based on NOLV. With respect to the valuation of the NBB inventory, the bankruptcy court reasonably concluded that the second-lien holders failed to meet their burden of demonstrating the NBB's value, and therefore did not err by valuing the NBB at zero. Similarly, since the bankruptcy court was not presented with any reasonable means of discounting the

letters of credit, it did not err by deducting their full face value from the value of the collateral. Accordingly, the bankruptcy court did not commit clear error by denying the second-lien holders' section 507(b) claims.

## IV. CONCLUSION

For these reasons, we **AFFIRM** the district court's judgment that in turn affirmed the judgment of the bankruptcy court.